# AFFIDAVIT IN SUPPORT OF
# A CRIMINAL COMPLAINT

I, Deputy John Forbes, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been employed in law enforcement for approximately 17 years. My current assignment is with the Strafford County Sheriff's Office as a detective within the Investigations unit. I am currently a Task Force Officer ("TFO") for Homeland Security Investigations ("HSI") in the Manchester, New Hampshire Office. During this assignment, I have participated in multiple intrastate and interstate narcotics investigations. Prior to this assignment, I was a member of the New Hampshire State Police Narcotics Investigations Unit. Prior to working at the Strafford County Sheriff's Office, I was employed by the Exeter, NH Police Department, and the New Hampshire State Police. I held the positions of Officer, Trooper, and Detective during my tenure at these two departments. I successfully graduated from the 145th New Hampshire Police Standards and Training Full-Time Police Academy in 2008.

2. From my training and experience, I have personally observed the sale and possession of various controlled substances including, but not limited to, marijuana, cocaine, cocaine base ("crack" cocaine), heroin, fentanyl, and methamphetamine. I am familiar with the types of packaging used to distribute controlled substances, as well as equipment used such as scales, bags, and cutting agents. I am familiar with equipment used to ingest and use controlled substances, such as needles, syringes, and smoking pipes. I have also learned the preferred methods of ingestion of various controlled substances such as smoking, injecting, snorting/ inhaling, along with dose sizes. I know that drug traffickers use counter-surveillance techniques to avoid detection. These techniques include operating or using several vehicles or vehicles registered in other people's names and the use of stash houses or alternate locations to store and

hide drugs and assets. Also, I have learned the methods of distribution of controlled substances such as marijuana, cocaine, crack cocaine, heroin, fentanyl, and methamphetamine. I have further learned through my training and experience that those subjects involved in the illegal distribution of narcotics have ties to other illegal crimes that involve money laundering, fraud and other deceptive behaviors. I have talked to drug dealers and listened to their conversations, so I am familiar with the coded language often used in these conversations. I also stay current on the latest technology used to investigate drug crimes.

3. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

## PURPOSE OF AFFIDAVIT

4. I submit this affidavit in support of a Criminal Complaint to support the arrest of and to charge Francisco Manuel Soto ("SOTO") with possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1). As set forth herein, there is probable cause to believe that in the District of New Hampshire, SOTO possessed fentanyl with the intent to distribute it in violation of this statute.

5. The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, and information received from other law enforcement officers. I have not set forth every detail I or other law enforcement agents know about his investigation but have set forth facts that I believe are sufficient to evaluate probable cause for the issuance of the requested complaint.

## STATUTORY AUTHORITY

6. This investigation relates to a crime in the District of New Hampshire involving possession with intent to distribute a controlled substance, namely, fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), which makes it a crime for any person to manufacture, distribute, dispense, or possess with the intent to distribute a controlled substance.

## PROBABLE CAUSE

### Background to Investigation

7. Since February 2022, members of the Strafford County Sheriff's Office Problem Oriented Policing Unit ("SCSO-POP") have been investigating the illegal sale of narcotics by persons in Strafford County, New Hampshire, in and around Rochester and Dover. As part of the investigation, SCSO-POP conducted several controlled purchases and seizures of fentanyl, cocaine, crack cocaine, and methamphetamine. Further, the SCSO-POP Unit obtained and executed several search and arrest warrants related to these investigations. SCSO-POP, with other law enforcement agencies, also interviewed suspected narcotics distributors and received information from various sources, including confidential sources ("CS"s) about narcotics distribution in Strafford County, such as sources of supply, phone numbers, "runner" vehicles, and financial information of higher volume distributors.

8. By analyzing the above information, agents and investigators of SCSO-POP and HSI (collectively, "law enforcement" or "investigators") identified Michael MARTINEZ as a supplier of fentanyl, cocaine, and methamphetamine to persons in New Hampshire and Maine. The MARTINEZ DTO is based in and around Lawrence, Massachusetts.

9. Through investigative methods, including direct messages from MARTINEZ to an HSI Undercover Agent ("HSI UCA") discussing where MARTINEZ is located, law enforcement determined that MARTINEZ operates his DTO in New England from the Dominican Republic.

10. Through investigative methods, including but not limited to controlled purchases, surveillance, and source debriefs, law enforcement learned that the MARTINEZ DTO uses "runners" to transport narcotics from Lawrence, Massachusetts, to New Hampshire and Maine. Once the MARTINEZ DTO receives an order for narcotics, MARTINEZ communicates that order to his runners in Lawrence and instructs the runners where to deliver the requested amount of narcotics and how much money the runner should collect for the order. This information has been established through surveillance of the runners and drug transactions, controlled purchases, and communications with MARTINEZ, in addition to other investigative techniques.

**Controlled Purchase from MARTINEZ DTO Using Confidential Source No. 1**

11. In or about January 2024, a confidential source ("CS#1")[1] began providing information to law enforcement about the MARTINEZ DTO and MARTINEZ.

---

[1] CS#1 is a narcotics addict who has provided information to law enforcement in consideration for favorable treatment regarding charges including possession of a controlled drug, transporting drugs in a motor vehicle, and felonious use of a firearm. CS#1 has a prior criminal history including narcotics and driving-related offenses. CS#1 has also been compensated about $1,600 for cooperation in this matter. Since becoming a confidential source, CS#1 was charged in New Hampshire with the following: kidnapping, simple assault, robbery, and criminal threatening. CS#1 has provided information in cases that resulted in the arrests of narcotics distributors and resulted in narcotics and currency seizures. Although CS#1 has a serious history of criminal behavior, the evidence developed from CS#1's participation in this investigation is reliable, due to the use of investigative controls, recordings, and corroboration via independent evidence.

12. On or about February 20, 2024, at the direction of law enforcement, CS#1 contacted MARTINEZ through the Signal[2] application on his/her phone at the phone number ending in 0429 listed in CS#1's Signal application as "yippy hippy," a number CS#1 knew to be associated with a drug supplier named "Miguel," whom law enforcement confirmed, through records regarding the phone number and records from the CashApp account used by CS#1, is MARTINEZ. In communications with CS#1 on Signal, MARTINEZ agreed to deliver a quantity of cocaine and fentanyl to CS#1 in New Hampshire. MARTINEZ told CS#1 that a female runner would be at a specified location at a business establishment in Dover to meet CS#1.

13. Later that same day, CS#1 met with the female runner in her vehicle at the specified location and completed the transaction: CS#1 handed the female runner $1,500 in cash, and the runner handed CS#1 what laboratory analysis later confirmed to be bags containing 19.71 grams of fentanyl and 55.31 grams of cocaine. Law enforcement used standard control measures for this drug transaction, including but not limited to searches of CS#1's person (which yielded negative results for any money or contraband not accounted for in the controlled purchase) before and after the transaction.

### Introduction of HSI Undercover Agent to MARTINEZ

14. During a phone conversation between CS#1 and MARTINEZ on or about February 20, 2024, CS#1 mentioned to MARTINEZ that CS#1 knew other customers looking for large quantities of narcotics.

---

[2] Signal is an encrypted messaging service for instant messaging and voice and video calls that can operate through an application on Android and Apple phones.

15. On or about February 26, 2024, MARTINEZ contacted CS#1 and asked CS#1 to provide contact information for these customers so MARTINEZ could contact them to sell them narcotics. In response, CS#1 then gave MARTINEZ the contact information for an HSI UCA.

16. At about 11:00 pm on or about February 26, 2024, MARTINEZ reached out to the HSI UCA on Signal. The HSI UCA began communicating with MARTINEZ, through text message and phone calls, about purchasing fentanyl and methamphetamine. During subsequent conversations with MARTINEZ, MARTINEZ asked the HSI UCA how much "up" and how much "down" the HSI UCA would want to order on a weekly basis. I know from my training and experience that "up" is cocaine and "down" is fentanyl. The HSI UCA stated that he/she was only interested in the "down" and that he/she would be looking for about 20-30 "sticks." I know from my training and experience that a "stick" is 10-grams of fentanyl. MARTINEZ stated that he would be able to supply that and more if the HSI UCA wanted additional quantities of fentanyl. MARTINEZ further stated that he would charge the HSI UCA $100 per "stick."

**The HSI UCA Arranges Multiple Controlled Purchases of Fentanyl with MARTINEZ**

17. Shortly after these initial communications with MARTINEZ, as early as March 3, 2024, the HSI UCA arranged with MARTINEZ to conduct controlled purchases of narcotics. Between March 3, 2024, and September 30, 2024, the HSI UCA arranged with MARTINEZ to conduct fifteen (15) controlled purchases of fentanyl from MARTINEZ at various locations in New Hampshire. Each time, the HSI UCA communicated with MARTINEZ to arrange the time and place for the transaction, as well as the amount of fentanyl to be purchased and the price, and each time, MARTINEZ would send a "runner" (drug deliverer) to deliver the fentanyl. The HSI

UCA would conduct the exchange of cash for fentanyl in each controlled purchase in the HSI UCA's vehicle or in the runner's vehicle.

### Federal Grand Jury Indictment

18.     On October 9, 2024, a federal grant jury in the District of New Hampshire returned an indictment charging ten individuals with participating in a conspiracy to distribute controlled substance.  The indictment included Michael MARTINEZ, who manages the DTO from the Dominican Republic, and nine other defendants associated with the MARTINEZ DTO including two "runners" who had delivered drugs to the HSI UCA in New Hampshire.

### Arrest of Charged Defendants and Controlled Buy with SOTO on October 16, 2024

19.     On October 15, 2024, the HSI UCA was in communication with MARTINEZ via the Signal application and phone conversations throughout the day.  During these conversations, the HSI UCA told MARTINEZ that they were in possession of $4,500 that was owed to MARTINEZ from a previous narcotics transaction for a kilogram of fentanyl.

20.     MARTINEZ and the HSI UCA further discussed MARTINEZ repaying the HSI UCA for a prior controlled purchase of 500 grams of fentanyl by the HSI UCA on September 17, 2024 that the HSI UCA claimed was "junk" (and not fentanyl).  MARTINEZ stated that he would make it up to the HSI UCA by providing 500 grams of fentanyl to replace the 500 grams of "junk" product, and then "fronting" the HSI UCA a kilogram of fentanyl.

21.     Later that evening, the HSI UCA informed MARTINEZ that they would not be able to meet tonight, and asked if they could meet the following morning.  MARTINEZ stated that would not be a problem, but he was only going to be able to supply the HSI UCA with the

500 grams for the replacement, and only 500 grams on the "front". MARTINEZ stated that he would be ready around 10:00 am the following morning. The HSI UCA arranged to meet with MARTINEZ's runner at a business establishment in New Hampshire at that time.

22. In the early morning of October 16, 2024, law enforcement officers executed search warrants at six residences associated with the MARTINEZ DTO and the defendants charged in the October 9, 2024 indictment: two residences in Massachusetts (one in Lawrence, and one in Methuen, respectively), and four residences in New Hampshire (two in Rochester, one in Berlin, and one in Somersworth). Among the residences law enforcement searched were that of his mother and brother, one of which officers suspected was a stash house used by the MARTINEZ DTO. In addition, officers arrested seven of the co-conspirators charged in the October 9, 2024 indictment, including MARTINEZ's mother and the two runners who had previously delivered drugs to the HSI UCA at MARTINEZ's direction.

23. Later that morning, on October 16, 2024, at approximately 9:49 am the HSI UCA received a Signal message from MARTINEZ, "im ready for u bro". The HSI UCA stated that they were running late and would be in the area of the meet location around 12:00 pm. MARTINEZ responded "ok". MARTINEZ never mentioned anything about the law enforcement operation that occurred that morning.

24. The HSI UCA asked if MARTINEZ could have his runner meet the HSI UCA further north than during previous meetings. MARTINEZ stated, "that spot is good whee we meet". The HSI UCA stated that they would let MARTINEZ know when they were about an hour out from the meeting location.

25. At approximately 11:48 am, the HSI UCA told MARTINEZ that they were about an hour away. At approximately 12:02 pm, MARTINEZ left a voice text asking for the address

of the meeting location.  The HSI UCA supplied MARTINEZ the address of a business establishment in Londonderry, NH.

26.     At this time, investigators established surveillance in the area of the agreed upon meeting location.  At approximately 12:24 pm, the HSI UCA informed MARTINEZ that the HSI UCA was about 43 minutes away from the meeting location.  At approximately 12:54 pm, MARTINEZ stated "im there in 10mins bro".  The HSI UCA asked if MARTINEZ was sending his usual runner (who had been involved in the majority of the controlled purchases the HSI UCA had arranged with MARTINEZ).  MARTINEZ stated that he was sending "my other cousin."

27.     At approximately 12:56 pm, the HSI UCA asked MARTINEZ what vehicle his cousin (the runner) would be driving.  At approximately 1:10 pm, MARTINEZ stated that he was going to ask and see where his cousin was.  At 1:11 pm, the HSI UCA communicated to MARTINEZ that the HSI UCA was pulling into the parking lot.

28.     MARTINEZ responded that his cousin was in a gray car with New Hampshire plates.  He described his cousin as "black Dominican" and asked if the HSI UCA saw him yet.  The HSI UCA stated that they saw a lot of vehicles.  MARTINEZ then supplied the HSI UCA a photograph facing the rear of gray Volkswagen NH-5489975 with a bumper sticker "Ski the EAS" parked at the gas pumps.

29.     At that time, surveillance units observed a dark-skinned Hispanic male looking at his phone and standing next to a gray Volkswagen with the New Hampshire plates and bumper sticker described above as it was parked at the gas pumps.  About that time, the Hispanic male entered the vehicle and began driving slowly around the parking lot.

30. As the Hispanic male drove around to the rear of the building, surveillance units confirmed that the license plate on the vehicle that he was driving was the one of which MARTINEZ had previously sent a picture to the HSI UCA.

31. Based on the fact that the license plate on the vehicle was the same one depicted in the photograph sent to the HSI UCA and the description of the driver was consistent with the description that MARTINEZ supplied of the runner, investigators initiated a stop of the motor vehicle.

32. Law enforcement officers made contact with the driver of the vehicle, removed him from the vehicle and identified him to be SOTO based on his Massachusetts Driver's License. Investigators then searched the vehicle. Inside the vehicle, investigators located two packages of what they believed to be, based on their training and experience as well as the appearance and packaging of the substance and the context of the controlled drug purchase, fentanyl secreted under an air compressor box in the trunk.

33. The packaging of the suspected fentanyl is consistent with previous narcotics purchased from the MARTINEZ DTO in that suspected fentanyl was packaged in heat-sealed bags with weight markings of "500" on each bag. The suspected fentanyl weighed approximately 1.04 kilograms in total. Laboratory analysis of the suspected fentanyl is pending.

34. Furthermore, investigators seized approximately $1,000 in US Currency and a cellular phone from inside SOTO's vehicle.

**CONCLUSION**

35.     Based on the foregoing, I submit that there is probable cause to believe that SOTO possessed with intent to distribute fentanyl in violation of 21 U.S.C. 841(a)(1).

/s/ John Forbes_____

Task Force Officer John Forbes
Homeland Security Investigations
U.S. Department of Homeland Security

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. P. 41 and affirmed under oath the contents of this affidavit and application.

Date: **Oct 17, 2024**

Time: **9:31 AM**

The Honorable Talesha L. Saint-Marc
United States Magistrate Judge

11